DAWN SESTITO (S.B. #214011)
dsestito@omm.com
JUSTINE M. DANIELS (S.B. #241180)
jdaniels@omm.com
LAUREN KAPLAN (S.B. #294703)
lkaplan@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071-2899
Telephone:  +1 213 430 6000
Facsimile:    +1 213 430 6407

STEVEN H. GOLDBERG (S.B. #140039)
sgoldberg@downeybrand.com
CHRISTIAN L. MARSH (S.B. #209442)
cmarsh@downeybrand.com
DOWNEY BRAND LLP
455 Market Street, Suite 1500
San Francisco, California 94105
Telephone:   +1 415 848 4800
Facsimile:    +1 415 848 4801

*Attorneys for Petitioner and Plaintiff*
Pacific Pipeline Company

*Attorneys for Plaintiff*
Exxon Mobil Corporation

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC PIPELINE COMPANY,<br><br>             Petitioner and<br>             Plaintiff,<br><br>EXXON MOBIL CORPORATION,<br><br>             Plaintiff,<br><br>      v.<br><br>SANTA BARBARA COUNTY PLANNING COMMISSION AND BOARD OF SUPERVISORS,<br><br>             Respondents and<br>             Defendants. | Case No.<br><br>**VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** |

Petitioner and Plaintiff Pacific Pipeline Company ("PPC") and Plaintiff Exxon Mobil Corporation ("ExxonMobil") hereby submit this Verified Petition for Writ of Mandate and Complaint for Declaratory Relief and Damages, directed to Respondents and Defendants Santa Barbara County Planning Commission (the "Planning Commission") and Santa Barbara County Board of Supervisors (the "Board"), and allege as follows:

## **INTRODUCTION**

1.      This case arises from the Planning Commission's and Board's unlawful refusal to approve PPC's permit applications to install automated safety valves on its Las Flores Pipeline System (the "Pipeline"), formerly known as Lines 901 and 903.  PPC's applications sought authorization to perform minor retrofits to comply with Assembly Bill 864 ("AB 864").  AB 864 requires operators of existing pipelines under the jurisdiction of the Office of the State Fire Marshal ("OSFM") located in or near the coastal zone to retrofit pipelines with "best available technologies" ("BAT") to reduce the volume of a potential oil spill—including technologies like the valves at issue here.  In this case, retrofitting the existing pipeline with automated safety valves—a compliance plan under the exclusive jurisdiction and approved by OSFM—*minimizes* the volume of a potential oil spill by stopping the flow of product in the event of a release, isolating segments of line and limiting the amount of product released.  The use of such safety valves is common for regulated pipelines and widely championed, including by OSFM and AB 864's author, Das Williams.  Now the Chair of the Board, Williams praised "the safety improvements [AB 864] made to oil pipelines around the state" and reiterated his "support [for] automatic shutoff valves"—even as he denied PPC's applications to install them.[1]

2.      Despite the obvious benefits of safety valves, OSFM's approval, and

---

[1] Aug. 22, 2023, Bd. Hrg. Trans. at 175:22-176:4, attached hereto as Exhibit A.

AB 864's mandates, County officials *twice* rejected PPC's applications and the well-supported recommendations of Santa Barbara County Planning and Development staff ("P&D Staff"). The sole question before the Planning Commission and Board—the only one they had authority to decide—was whether the applications for sixteen safety valves, which the County collectively referred to as the "Project," comply with applicable local law. They do.

3.  The Planning Commission and Board chose to ignore the record, law, and limited scope of their review in an unlawful attempt, and with full intention, to keep the Pipeline from transporting oil and to prevent suppliers of the Pipeline, such as the Santa Ynez Unit ("SYU") offshore platforms and Las Flores Canyon ("LFC") production facility (both owned and operated by ExxonMobil), from restarting. In doing so, the Planning Commission and Board (a) flouted the provisions and purposes of the County's zoning ordinances and AB 864's mandate to install BAT technologies, like the safety valves; (b) issued and left in place a decision that is not supported by *any* evidence, let alone substantial evidence; and (c) exceeded their jurisdiction by seeking to regulate pipeline safety and operations, which lie beyond the County's jurisdiction under well-established principles of state and federal law. The Project denial was arbitrary, capricious, and entirely lacking in evidentiary support. It should be set aside and the Planning Commission and Board should be directed to approve the installation of the safety valves. In the alternative, these actions—which substantially affect PPC's fundamental vested right to restart the Pipeline—*at minimum* require *de novo* review by the Court exercising its own independent judgment, reversal, and reconsideration. In addition, PPC and ExxonMobil are entitled to declaratory relief for the violations of their constitutional rights.

4.  A decision in PPC's favor will ensure that Santa Barbara County has the best technology to significantly minimize the impacts of releases in the coastal zone. In 2021, Plains Pipeline, L.P. ("Plains")—PPC's predecessor in interest—

submitted an Implementation Plan and Risk Analysis (the "Plan") to OSFM, which included an array of safety and spill-prevention enhancements that OSFM has determined to be BAT for the Pipeline under AB 864's regulations, including the valves at issue here.  After a "highly complicated and engineering intensive evaluation by skilled engineers with decades" of experience, OSFM—the agency with sole and exclusive authority and the expertise for administering pipeline safety—approved the Plan.[2]

5.     Having secured OSFM's approval, Plains then sought authorization from Kern, San Luis Obispo, and Santa Barbara Counties to install valves consistent with the Plan, at key points along the Pipeline to most effectively reduce any potential release.  Kern and San Luis Obispo authorized the installation of the valves under their respective local zoning ordinances for the sections of the Pipeline in their respective counties.

6.     What happened in Santa Barbara County is a very different story. Indeed, upon information and belief, the County via the Planning Commission and Board is the *only* county that has refused to approve zoning clearances to allow a pipeline operator to timely comply with AB 864's BAT mandate.  And Defendants did so for purposes well beyond the bounds of their discretion.

7.     Plains submitted sixteen separate applications—one for each automatic safety valve, each of which function independently to provide an incremental reduction in potential spill volume in the scenario of a release—which were approved by the Santa Barbara County Zoning Administrator on August 22, 2022. In issuing the approval, the Zoning Administrator found that the valves would "*significantly reduc[e] the volume of a potential pipeline release by providing best available technology*."[3]  In September 2022, three parties filed appeals relating to

---

[2] OSFM, Pipeline Safety Division, Santa Barbara County Board of Supervisors August 22, 2023, Meeting at 3.

[3] Zoning Admin's. Action Ltr. (Aug. 24, 2022) at 8 (emphasis added).

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

*some*—but not *all*—of the valves at issue, triggering further review.

8.      In October 2022, PPC acquired the Pipeline as well as all in-process and issued permits and worked closely with the P&D Staff to evaluate the valve applications and ensure compliance with applicable law, including the County's land-use regulations, in response to these appeals.

9.      On February 2, 2023, the P&D Staff issued a comprehensive report (the "Staff Report") finding that the Project so complied and recommending the Planning Commission approve it and deny the three appeals.

10.      However, the Planning Commission rejected that recommendation. On April 26, 2023, it voted 3-2 to grant the appeals and deny the Project *in toto*, even though the appeals only applied to *nine* of the *sixteen* valves.  The Planning Commission based this decision on two pretexts—neither supported by substantial evidence, both contrary to the law.

11.      *First*, the Planning Commission asserted that certain valves and their stations—which would be either invisible or barely visible—were not compatible with "the otherwise rural landscape" of the Gaviota Coast, in violation of the Santa Barbara Costal Zoning Ordinance ("CZO").[4]  But, as confirmed in an expert report—the only evidence in the record that analyzed the valves' proposed locations and their impact on public viewshed—and corroborated by the Staff Report, the valves were compatible with the Gaviota Coast.  Check valves are located entirely underground and have no visual impacts.  For valves with equipment located above ground, the Gaviota Coast is already dotted with other "industrial infrastructure," including utility power lines, valves and stations for natural gas pipelines, and *existing* valves that were previously installed on the Pipeline.  Moreover, the majority of the proposed Pipeline valves are located outside of the County's coastal zone (the "Coastal Zone") and the scope of the CZO.

---

[4] Plan. Comm'n (Apr. 26, 2023) Finding 2.l.l.3.E.





*View of proposed location for valve MOV1-890P from Highway 101*

12.    *Second*, defying common sense and the legislative findings underpinning AB 864, the Planning Commission found that the safety valves—which OSFM confirmed would reduce the impact of a Pipeline release—would be somehow "detrimental to health, safety, comfort, convenience, and general welfare of the neighborhood and environment," in violation of the CZO and Land Use and Development Code ("LUDC").[5]  That finding was based on unsubstantiated conjecture about the current state of the Pipeline and the knock-on impacts of restarting the Pipeline, such as restarting LFC and SYU.  These issues were *not* before the Planning Commission and lie beyond its jurisdiction.  Adding error on top of error, the Planning Commission's decision also impermissibly invaded the statutory domain of OSFM and the Pipeline and Hazardous Materials Safety

---

[5] *Id.* Finding 2.l.2.1.A; *see also id.* Findings 2.l.3.1.A, 2.2.1.1.A, 2.2.2.1.A (same).

Administration ("PHMSA")—the state and federal agencies with exclusive jurisdiction over the Pipeline's safety, integrity, and operation—charged with overseeing any restart of the Pipeline pursuant to a 2020 consent decree entered in *United States of America et al. v. Plains All American Pipeline L.P. et al* (Case No. CV 20-02415).[6]

13.     PPC appealed the Planning Commission's clearly erroneous denial of the Project to the 5-member Board, which held a hearing on August 22, 2023.  With one member not voting, the remaining members split 2-2.  The practical effect of this 2-2 split meant it left the Planning Commission's arbitrary and unlawful decision in place and effectively denied the Project.

14.     The comments from Board members who voted against the Project make clear that their decision had nothing to do with the Planning Commission's rationale, the law, or with the Project itself, which solely concerned the installation of the safety valves.  They simply do not want to allow the Pipeline to flow oil or for LFC and SYU to restart production.  Supervisor Laura Capps voted against the Project and made clear that she did so because of concerns about climate change:

> ***I respect that we're being asked to talk about valves, but*** it defies logic for me that you would need safety valves if you don't restart…I was elected to look at the big picture, and the big picture is climate change.  It's reliance on fossil fuels…. ***Mass climate events continue to happen and yet we're being asked to say thumbs up or thumbs down on a myopic piece of this.***  Well I say no to that.…I'm tasked with looking at the future.  And ***for me, this is about restarting.***  This is about putting oil back in that pipeline and having safety valves for that use, and ***that is not something I can stand behind***.[7]

Chair Williams, who authored AB 864 and claims he is "still proud" of the law and

---

[6] *See generally,* Dkt 6, *United States of America et al. v. Plains All American Pipeline L.P. et al.*, Consent Decree dated March 13, 2020, at Appendices B and D.

[7] Ex. A, Bd. Hrg. Trans. at 170:16-171:12 (emphasis added).

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

"still support[s] automatic shutoff valves," also voted to deny the Project, stating:

> I just think that there are changed circumstances that warrant a broader understanding of the impacts of this project… ***I cannot remove this decision from the context of the damage that's being made to the world*** [by oil and gas] and that is as clear as the color of the sky to me, nor what damage has been made to our community.[8]

15.     As with the Planning Commission, neither climate change nor the restart of crude oil production at LFC and SYU were before the Board or within its power to ban.  The Pipeline's safety, restart, and operation are also beyond the authority of the Board, falling under the exclusive jurisdiction of PHMSA and OSFM.  Only the Project—i.e., the individual permit applications for the installation of the sixteen valves—was at issue.

16.     Plaintiffs have been trying for years to restart the flow of crude oil and enjoy their constitutionally protected property rights.  ExxonMobil has a vested right to restart SYU, which has been shut in since May 2015, after a part of the Pipeline ruptured while it was owned and operated by Plains.  These efforts started with an interim trucking project, which the Board denied, and ExxonMobil sought review via a writ of mandate.  As part of its opposition to the trucking writ, the Board emphasized that its preferred method to move oil is via pipeline and the writ was denied.  Thus, the Pipeline stands as SYU's only means to transport its oil to market.  Intentional attempts to stop the Pipeline from restarting also infringe ExxonMobil's vested rights.

17.     PPC has a vested right to flow oil through the Pipeline, and it will work with OSFM and others to do so.  But PPC must comply with AB 864 in some manner.  Safety valves are customary equipment for pipelines and potential technology to be used in compliance with AB 864.  Yet the Planning Commission

---

[8] *Id.* at 176:12-22 (emphasis added).

and Board blocked the Project, using local zoning and planning rules as if they were sweeping policies to stop the lawful transportation of oil within the County.

18.     This unlawful result should not stand.  PPC seeks a writ of mandate pursuant to California Code of Civil Procedure § 1085 compelling the Board to vacate and set aside the arbitrary and capricious denial of the Project, which entirely lacks evidentiary support, and directing that the valve permit applications be approved.  In the alternative, the writ should issue pursuant to California Code of Civil Procedure § 1094.5 because the Planning Commission and Board exceeded their jurisdiction, failed to act in the manner required by the law, and issued findings not supported by substantial evidence.  The Court should direct that the valve permit applications be approved or, in the alternative, order reconsideration of the sixteen valve applications in light of the County's limited jurisdiction.

19.     The Planning Commission and Board's decision also violates (a) the Supremacy Clauses of the United States and California Constitutions, which preempt state or local governments from interfering in a field fully occupied by federal agencies and law; (b) the Commerce Clause of the United States Constitution and Implied Commerce Clause of California Constitution by unjustifiably discriminating against commerce of oil in or through Santa Barbara County; and (c) the limitations on the County's police powers by affecting residents outside of Santa Barbara County without due consideration of the regional welfare. Plaintiffs seek declaratory judgment and damages for the violations of their constitutionally protected rights.[9]

---

[9] In spite of the Planning Commissions ongoing efforts to stymie Plaintiffs' ability to use and enjoy their lawful property—including their efforts to interfere in PPC's compliance with AB 864's BAT mandate in an attempt to prevent the Pipeline from restarting—PPC continues to pursue available alternatives.  If PPC is ultimately not able to comply with AB 864 without installing safety valves in Santa Barbara County, then Plaintiffs will seek just compensation for the loss of their property.

## JURISDICTION AND VENUE

20.     This action arises under the laws of the United States and the State of California.  This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and over the state law claims pursuant to 28 U.S.C. § 1332.  Plaintiffs and Defendants are citizens of different states, and the aggregate amount in controversy and the value of the rights at issue in this action exceed the sum of $75,000 exclusive of interest and costs.  Further, this Court has supplemental jurisdiction over the California state law claims pursuant to 28 U.S.C. § 1367.

21.     The Court has the authority to grant mandamus relief pursuant to California Code of Civil Procedure §§ 1094.5 and 1085.  PPC exhausted its administrative remedies by appealing the Planning Commission's denial to the Board.  The Board's tied vote is an effective denial of its appeal, leaving in place the Commission's denial of the Project.[10]

22.     The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and California Code of Civil Procedure § 1060.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside in the Central District of California and a substantial part of the events or omissions giving rise to this action occurred there.[11]

---

[10] The Board's tied vote or "no action" is not appealable to the Coastal Commission, particularly as the County failed to present the Commission with any notice of final action pursuant to Cal. Code Regs. Tit. 14, § 13571(a).  In any event, the County's choice to treat the separate valve applications as one lump "project" frustrates any appeals to the Coastal Commission, whose jurisdiction is limited to the coastal zone.  As discussed, *infra* ¶ 41, only *seven* of the *sixteen* valves are located in the coastal zone.  Moreover, further appeals to the Board would be futile.  The Board consists of five sitting members, one of whom recused herself from voting due to potential conflicts of interest.  During the August 22 hearing, the Clerk inquired whether a continuance would allow the Board to break the tie, and all said no.  *See* Ex. A, Bd. Hrg. Trans. at 181:2-9.  P&D Staff has since confirmed the same, indicating that there is no alternative valve configuration that they believe the Board would approve.

[11] The filing of this complaint and Plaintiffs' participation in this lawsuit shall not be construed as a waiver of personal jurisdiction defenses in any other matter.  Plaintiffs do not consent to personal jurisdiction in California in connection with any other matter.

## PARTIES

24.    Petitioner and Plaintiff Pacific Pipeline Company is a Delaware corporation, headquartered and with its principal place of business in Texas.  PPC is a wholly owned subsidiary of Mobil Pacific Pipeline Company, which in turn is an indirectly, wholly owned subsidiary of Exxon Mobil Corporation.  PPC owns the Las Flores Pipeline System, its sole asset.

25.    Plaintiff Exxon Mobil Corporation is a New Jersey corporation, headquartered and with its principal place of business in Texas.  ExxonMobil owns and operates SYU, which consists of the three offshore oil and gas platforms located in federal waters approximately 12 miles west of the County and LFC, an onshore processing facility located in Las Flores Canyon, near Goleta.

26.    Respondent and Defendant Santa Barbara County Planning Commission is composed of five Commissioners, appointed with full approval of the Board, and charged with implementing Santa Barbara County's general plan through actions including, but not limited to, the administration of specific plans and zoning and subdivision ordinances.

27.    Respondent and Defendant Board of Supervisors of the County of Santa Barbara is Santa Barbara County's legally constituted legislative body and is composed of five elected officials.

## GENERAL ALLEGATIONS

**A.    The California Legislature Passed AB 864 With Widespread Support, Including the Board's.**

28.    In 2015, the California Legislature enacted AB 864—authored by then-State Assembly Member Das Williams in response to an accidental release from this Pipeline[12]—to add Section 51013.1 to the Elder California Pipeline Safety

---

[12] July 14, 2015, Senate Committee on Natural Resources and Water Bill Analysis and the September 1, 2015, Senate Rules Committee Bill Analysis ("Had the [Pipeline] been equipped with automatic shut off valves or remote controlled sectionalized block valves, the impact of the oil spill would have been controlled and limited."); *see also* Sept. 14, 2015 Letter from D.

- 11 -

Act in order to *improve* pipeline safety and *reduce* the risks associated with potential releases of oil from pipelines in the coastal areas of California.[13] Specifically, the legislation requires pipeline operators in environmentally sensitive areas to use BAT including, but not limited to "leak detection technologies, automatic shutoff systems, *or* remote controlled sectionalized block valves, or any combination of these technologies" to reduce the volume of potential spills in these areas.[14]

29.    As AB 864 made its way through the legislative process, the bill had many supporters, *including the Santa Barbara County Board of Supervisors*.[15]

30.    The Department of Fish and Wildlife recognized "[i]mproving pipeline technology for pipelines that operate in the coastal zone will lessen the chance of oil spills in those delicate areas" and supported passing AB 864.[16]  The Department of Forestry and Fire Protection recommended that then-Governor, Jerry Brown, sign the bill because "it's necessary to enhance public safety, protect California's vital natural resources, and reduce the risk of future oil spills."[17]  Other California departments also expressed their support.[18]

---

Williams to J. Brown regarding Request for Signature on Assembly Bill 864 ("My bill will not only help reduce the amount of oil spilled, but prevent oil spills").

[13] As emphasized during the July 14, 2015, Senate Committee on Natural Resources and Water Bill Analysis and the September 1, 2015, Senate Rules Committee Bill Analysis, "[e]arly oil spill detection technology and automatic shut off controls are critical tools in preserving California's ocean waters, coastline, and wildlife."  Ex. A (AB 864 Legislative History Excerpts).

[14] Cal. Gov't Code § 51013.1(b)(1) (emphasis added); *see also* 19 Cal. Code Regs. §§ 2100-2120 (implementing regulations).

[15] *See, e.g.*, Senate Rules Comm., Sept. 14, 2015, AB 864 Third Reading at 6 (listing Santa Barbara County Board of Supervisors as a supporter); *see also id.* at 5 (listing the California Coastal Commission).

[16] Sept. 17, 2015, Cal. Nat. Res. Dep't of Fish & Wildlife, Enrolled Bill Rep. at 1.

[17] Sept. 17, 2015, Cal. Nat. Res. Dep't of Forestry & Fire Prot., Enrolled Bill Rep. at 1.

[18] *See, e.g.,* Sept. 18, 2015, Cal. Nat. Res. Dep't of Fin., Enrolled Bill Rep. at 1 (Department of Finance recommending signature because the bill would "result in better protection of California's coastline and wildlife in environmentally sensitive areas from oil spills").

31.     More than 40 environmental organizations—including the Gaviota Coast Conservancy ("GCC")—voiced their support, telling then-Governor Brown that AB 864's "oil pipeline safety improvements will provide the needed safeguards to protect our coastal and ecologically sensitive areas."[19]

32.     AB 864 went from bill to law mere months after its introduction. OSFM was charged with drafting the implementing regulations for AB 864 and granted exclusive authority to enforce them.[20]  As the OSFM explained, "[e]xisting State and Federal laws [regulating the safety of intrastate hazardous liquid pipelines] focus on protection of the health and safety of individuals and the environment."  OSFM's implementing regulations for AB 864 work in tandem with this existing regulatory scheme "to protect environmentally and ecologically sensitive areas and state waters and wildlife by reducing the volume of oil released in the event of a spill."[21]

**B.     OSFM Approved the Automatic Shutoff Safety Valves and Other BAT Measures for the Pipeline.**

33.     OSFM and PHMSA have designated the Pipeline as "active." Accordingly, the Pipeline remains subject to state and federal requirements for inspection, maintenance, and safety regulations administered by OSFM.  These include AB 864's directive that operators of applicable pipelines must implement

---

[19] Sept. 16, 2015, Letter from Various Organizations to J. Brown regarding AB 864 (Williams)—Oil Spill Pipeline Safety—Request for Signature.

[20] *See* Cal. Gov't Code §§ 51013.1(g)(2), 51010 ("It is the intent of the Legislature . . . that the State Fire Marshal shall exercise *exclusive safety regulatory and enforcement authority* over intrastate hazardous liquid pipelines. . ..") (emphasis added); Cal. Gov't Code § 51013.1(c) (directing OSFM to promulgate regulations pursuant to this section, including defining automatic shutoff systems, creating a process to assess the adequacy of the operator's risk analysis, creating a process by which an operator may request confidential treatment of information submitted in the plan, and determining how near to an environmentally and ecologically sensitive area a pipeline must be to be subject to the requirements of Section 51013.1).

[21] OSFM, Initial Statement Re: AB 864 Regulations (Feb. 5, 2019) at 1, 2.

BAT measures.[22]

34.     The Pipeline consists of two separate lines—CA-324 and CA-325— that together run from SYU's Las Flores Canyon to the Pentland Station in Kern County.  The first line, CA-324, runs approximately 11 miles west along the Gaviota Coast from SYU's Las Flores Pump Station to the Gaviota Pump Station. The second line, CA-325, runs approximately 62 miles from Gaviota Pump Station west along the Gaviota Coast, north through the Sisquoc Pump Station, then northeast into San Luis Obispo County, and terminating at the Pentland Station in Kern County.

35.     PPC must comply with AB 864 on CA-324 and CA-325 to obey the law.  Before it sought the County's approval for the Project, Plains submitted its AB 864 Plan to OSFM.  The Plan included a collection of different safety and spill-prevention enhancements including not only the safety valves at issue here—which close automatically in the event of a suspected rupture—but also enhanced leak detection tools, additional flow and pressure sensors, and automatic shut-off systems.  OSFM has sole responsibility for determining what constitutes BAT, and after thorough review accepted the Plan, finding it met the requirements of AB 864.[23]

36.     While they have been recognized by OSFM as a BAT, there is nothing new or unique about safety valves.  Such valves are common pipeline appurtenances that have been used for over a century on pipeline systems.  They are not only used in pipelines flowing liquids, in California or near the Coastal Zone, but across the nation for water, oil, gas, and other commodities.  In fact, the Pipeline *already* contains 20 safety valves, 16 of which were previously installed in and approved by Santa Barbara County and incorporated into the Final

---

[22] Cal. Gov't Code § 51013.1(b)(1); *see also* 19 Cal. Code Regs. §§ 2100-2120 (implementing regulations).

[23] *See* Staff Rep. at 30-31.

Development Plan Conditions for the Pipeline ("Pipeline Development Plan").[24]

37.    As OSFM explained in its presentation to the Board during the August 22, 2023, hearing:

- The analysis to identify the locations and types of additional valves is a highly complicated and engineering intensive evaluation by skilled engineers with decades of pipeline operations, regulatory, and inspection experience.

- Pipelines are required to install best available technology, including leak detection and valves (among other requirements), based on a risk analysis that is reviewed and approved by the OSFM.

- The technologies must limit the volume of oil spilled based on a worst-case discharge scenario.

- In the evaluation of the risk analysis, valves were placed in key points along the line to most effectively reduce the volume of discharge.[25]

Based on this evaluation, OSFM concluded that if there was a failure in the Pipeline, "these valves will reduce the spill volume and represents [sic] a best available technology."[26]

38.    The only part of the OSFM-approved Plan subject to local government review was the installation of new safety valves.  Kern and San Luis Obispo authorized the installation of the valves under their respective counties' local zoning ordinances.  Santa Barbara County, on the other hand, rejected safety valves, twice.  Upon information and belief, PPC is the only pipeline operator in California that has been unable to timely comply with AB 864 due to a county's

---

[24] *See, e.g.,* Zoning Admin's. Action Ltr. at 7-8 (emphasis added); Staff Rep. at 15; Pipeline Development Plan at 4, 15-16, 35.

[25] OSFM, Pipeline Safety Division, Santa Barbara County Board of Supervisors August 22, 2023, Meeting at 3.

[26] *Id.* at 4.

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

delay and/or refusal to grant zoning permits.

**C.    The Zoning Administrator Approved the Safety Valves, Each of Which Functions Independently to Reduce Volume of a Potential Oil Spill.**

39.    After receiving OSFM's approval, Plains in December 2021 and March 2022 submitted individual zoning clearance applications for the safety valves to the County.  Under the LUDC, a zoning clearance is generally ministerial because it only requires determination of consistency with applicable laws and existing development plans.[27]  The safety valves met the requirements for a clearance: they require relatively minimal ground disturbance—similar to an anomaly dig or pipeline segment repairs (for which the County has previously issued zoning clearances)—and would reduce the environmental impacts of a release outlined in the existing Pipeline Development Plan.  Moreover, both valves and significant construction projects were included in the initial project description in the Pipeline Development Plan—thus, installation of additional valves is wholly consistent with that plan.[28]  Nevertheless, the County insisted on reviewing the applications as amendments to the Development Plan.

40.    Ultimately, Plains requested approval for 16 individual safety valves: 11 motor-operated valves ("MOVs") and five check valves ("CHKs").[29]  While the County ultimately lumped all these applications together under the umbrella of a single Project—which the Planning Commission's and Board's erroneous denial capitalized on—the two different types of valves operate in different ways and have different infrastructure requirements:

- **MOVs** are equipped with an electrical shut-off system connected to utility lines or a solar power source.  Since a small portion of the

---

[27] LUDC § 35.82.210.B.2.

[28] *See id.* § 35.82.210.D.1; Pipeline Development Plan at 15, 17.

[29] Each valve has independent utility and can be approved and implemented separately.  If installation of any of the individual valves was not approved, the others could still be approved and installed to serve their essential purpose.

valves would be connected to the subterranean Pipeline protrude above-ground and their electrical panels are co-located, they require above-ground fences for security.  For instance, each MOV station would include a fenced-in utility area of between 1,150 and 1,800 square feet to store a below-ground MOV; two corrugated steel vaults, each three feet in diameter, placed over the valve's pressure sensor apparatus; an electrical panel; a cellular or satellite communication device; and a battery and associated solar panels.

- **CHKs** are equipped with an automatic shut-off system with one-way flow closure and lockable steel-lid closures.  They require no above-ground infrastructure.

41.    Only seven valves were proposed to be located in the County's Coastal Zone: CHK 1-710P, MOV1-210P, MOV1-220P, MOV1-610P, MOV1-790P, MOV1-890P, and MOV1-990P.



*Map of proposed valve installations in the Coastal Zone*

The remaining nine valves in Santa Barbara were proposed to be installed outside

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

the Coastal Zone: CHK2-610P, MOV2-690P, MOV2-1010P, CHK2-1110P, MOV2-1190P, MOV2-1290P, CHK3-210P, MOV3-290P, and CHK3-490P.

42.    Regardless of their type or location, each valve has independent utility—functioning independently and separately providing incremental reduction in potential spill volume in the scenario of a release.

43.    The Zoning Administrator authorized the safety valves pursuant to discrete amendments to the Pipeline Development Plan.  In doing so, the Zoning Administrator found that:

> The *[P]roject is necessary to meet the requirements of Assembly Bill 864*…*which requires pipeline operators to install Best Available Technology* ("BAT") on existing pipelines in the Coastal Zone to reduce the volume of a potential release.  As required by Assembly Bill 864, a risk analysis was conducted along Line 901 & 903 and determined that *retrofitting the pipeline with 16 new valves would significantly reduce the amount of fluid released in the event of a potential line failure*.[30]

44.    The Zoning Administrator also (correctly) found that the Project "is exempt from environmental review under the California Environmental Quality Act (CEQA)" and that it "will not create any new significant effects or a substantial increase in the severity of previously identified significant effects on the environment nor present new information of substantial importance pursuant to CEQA Guideline 15162."[31]  And the Zoning Administrator further found that the installation of the valves would comply with all applicable laws and development plans.[32]

**D.    The Planning Commission and Board Abused Their Discretion in Denying the Project.**

45.    Ironically, AB 864's erstwhile champions—including Chair Williams

---

[30] Zoning Admin.'s Action Ltr. at 16, 27 (emphasis added).

[31] *Id.* at 6.

[32] *Id.* at 7-15.

and GCC—opposed PPC's efforts to comply with the legislation's mandate to apply BAT measures to the Pipeline.

46.    In September 2022, three parties—including GCC—filed appeals challenging the Zoning Administrator's approval of nine of the sixteen valves. Specifically, those parties challenged valve nos. CHK1-710P, MOV1-210P, MOV1-220P, MOV1-610P, MOV1-790P, MOV1-890P, and MOV1-990P— intended for installation in parts of the Pipeline located in the Coastal Zone—and valve nos. CHK2-610P and CHK3-490P—designated for installation outside of the Coastal Zone.

47.    The Planning Commission granted those appeals and denied the *entire* Project. This decision was made in excess of the Planning Commission's jurisdiction. The appeals only applied to nine of the sixteen valves. For the seven valve sites that were not the subject of any appeal—MOV2-690P, MOV2-1010P, CHK2-1110P, MOV2-1190P, MOV2-1290P, CHK3-210P, MOV3-290P—the Zoning Administrator's approval should have remained in place. Notwithstanding the limited scope of the appeals, the denial extends to all 16 valves.

48.    Without identifying any evidence (because there was none), the Planning Commission based its decision on the pretense that the safety valves (a) were not "compatible with the established physical scale" of the Coastal Zone (CZO § 35-169.4.3); and (b) would be "detrimental to the health, safety, comfort, convenience, and general welfare of the neighborhood and environment" (CZO §§ 35-172.11.2, 35-174.10.2; LUDC § 35.84.040.D.3).

49.    PPC timely appealed this decision to the Board. The Board acted contrary to the law when it left the Planning Commission's clearly erroneous decision in place.

50.    Neither the Planning Commission's nor the Board's decision was supported by the evidence in the record. And both were made in a manner contrary to the law.

1.      **The Valves Are Compatible with the Physical Scale of Their Respective Locales; And Most Are Located Outside of the Coastal Zone and Lie Beyond the Scope of the CZO.**

51.     The Planning Commission voted to deny the entire Project based on purported violations of CZO section 35-169.4.3., finding that:

> [T]he [P]roject will not be compatible with the established *physical scale* of the project area because the *Motor Operated Valve [MOV] stations require construction of permanent aboveground equipment within the Gaviota Coast which will be visible from public view sheds*.  The Gaviota Coast is not an adequate location for the *valves* because they *will add scattered industrial infrastructure* to the otherwise rural landscape.[33]

But of the *sixteen* valves at issue, only *six* were above-ground MOV valves located in the Coastal Zone.

52.     To assess physical compatibility concerns, PleinAire Design Group ("PleinAire")—a premier landscape architecture firm with over 30 years of experience in California, including the Central Coast—conducted a visibility analysis on the six coastal MOVs at issue, taking into account both the potential visibility of the MOVs and existing structures in the area to determine whether they are compatible with the environment.[34]  PleinAire's Visual Station Impact Analysis concluded that of the six proposed MOV stations, none would be visible from public locations like Baron Ranch Trail or vista points along Highway 101.  Only four would be visible from the road at all.  And those four stations would be visible from Highway 101 for only a matter of seconds, making them virtually imperceptible given the (i) speed of travel, (ii) the stations' distance from the road, and (iii) land cover.[35]

---

[33] Plan. Comm'n (Apr. 26, 2023) Finding 2.1.1.3(E) (emphasis added).

[34] PleinAire Design Grp., Valve Station Impact Analysis at 1.

[35] *Id.* at 5-6.

- 20 -



***Viewshed for MOV-890P—visible from Highway 101 for 5 secs. going South and 2 secs. North***

53.    And contrary to the Planning Commission's finding that these barely visible structures would be out of place in the Coastal Zone, PleinAire found that the proposed valve station design would be consistent with the existing industrial structures—including a host of electrical, water, and gas infrastructure—already located along the Gaviota Coast.[36]

---

[36] *Id.* at 2, 5.

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES



*Existing SoCalGas natural gas valve located on Gaviota Coast*

54.    P&D Staff reached the same conclusion as PleinAire—the only expert analysis undertaken—finding that the proposed design of "the four valves that will be minimally visible from 101 viewsheds" was undertaken with "the intent to decrease and minimize each site's visibility through minimization of massing, use of existing topography, vegetation, surrounding structures, and the ability to blend in with the surrounding environment," particularly as compared to existing above-ground utility infrastructure that already exists in the Gaviota viewshed.[37]  Indeed, there are 11 *existing*, above ground valve station for the Pipeline located on the Gaviota Coast.[38]  *There is no contrary evidence in the record* analyzing the valves' proposed installation sites or their impact on viewshed.

---

[37] Staff Rep. at 11.

[38] *See, e.g.,* Zoning Admin's. Action Ltr. at 7-8 (emphasis added); Staff Rep. at 15; Pipeline Development Plan at 4, 15-16, 35; PleinAire Design Grp., Valve Station Impact Analysis at 1.



*Existing Pipeline valve located on Gaviota Coast*

55.    Nothing in the record provides a basis for denying the applications for the remaining ten valves.  The Planning Commission and Board's aesthetic findings were specific to MOV valves and their "permanent aboveground equipment," in the Coastal Zone.  CHK 1-710P—the only other valve designated for that area—would be installed below ground, entirely concealed from public view.  And the other nine proposed valves would be located outside the Coastal Zone, thus there is no legal basis for applying the Planning Commission's finding to those valves.  The Planning Commission and Board must comply with the law.  By its own terms, the CZO *only* applies to "development[s] or use[s] in the Coastal Zone of the County."[39]

56.    In applying the CZO to valves designated for use outside the Coastal

---

[39] CZO § 35-169.2.1; *see also id.* § 35-51 ("Any person…wishing to perform or undertake any development within the Coastal Zone of the unincorporated area of the County of Santa Barbara shall comply with the provisions of this Article…").

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Zone, the Planning Commission distended the County's own ordinance beyond its statutory boundaries and failed to proceed in a manner required by law.  And the Board acted contrary to law when it left the Planning Commission's decision intact.

**2.      The Valves Would Minimize Future, Potential Oil Spills; All Other Considerations Were Outside of the Planning Commission's and Board's Jurisdiction.**

57.      The Planning Commission also voted to deny the Project based on supposed violations of CZO sections 35-172.11.2A, 35-174.10.2. A,[40] and LUDC section 35.84.040.D.3:

> [W]hile ***the severity of a potential future oil spill could be minimized through installation of the proposed sixteen new valves***, the frequency of a potential future spill may be increased because of the degradation to the pipeline's integrity that has occurred since its commissioning in 1994.  ***Oil spill related impacts may still occur even after*** successful implementation of mitigation measures imposed as part of the original project approval, as well as ***the proposed valve installations, due to several factors that have acted in combination to cause degradation of the line*** including inadequate inspection intervals, a lack of adequate anomaly repairs, internal corrosion, and corrosion under insulation (external corrosion).  ***The risks of an oil spill are elevated above what was previously approved and the project would be detrimental to the health, safety, comfort, convenience, and general welfare of the neighborhood and environment***.[41]

The Planning Commission's ultimate conclusion that safety valves "would be detrimental to . . . health, safety, comfort, convenience, and general welfare of the neighborhood and environment" cannot be reconciled with the evidence in the record.  Safety valves *minimize* oil spills; valves do not cause them.

58.      The Planning Commission conceded as much, when it found that "severity of a potential future oil spill could be minimized through installation of

---

[40] As discussed above, these CZO sections cannot apply to the valves designated for installation outside the Coastal Zone.  The Planning Commission's and Board's decision to do so was clearly erroneous.  *See, supra,* ¶ 55, fn. 39.

[41] Plan. Comm'n (Apr. 26, 2023) Finding 2.1.2.1(E).

the proposed sixteen new valves."  The Board inherited that concession when it left the Planning Commission's decision in place.  And neither made any findings, nor is there any evidence in the record to the support the conclusion, that the sixteen safety valves at issue are in any way detrimental to the County, its citizens, or the environment.

59.    Nor could they.  AB 864 and the BAT measures it requires "*benefit public health, safety, and general welfare* of California residents and businesses, while further protecting the environment and vital natural resources."[42]  OSFM would not have approved the Plan if it thought that the safety valves did not meet these criteria.  Indeed, OSFM guidance makes clear that the Planning Commission's and Board's decision to deny the Project is detrimental to the general welfare and environment because "the alternative of no regulatory action would *not* be in the best interest of the public because the health and safety benefits conferred through the legislation cannot be achieved absent regulatory action."[43]

60.    During the August 22 hearing before the Board, OSFM reaffirmed its approval of installing safety valves in the Pipeline.  There, Assistant Deputy Director of OSFM, Chief Jim Hosler testified:

> OSFM believes that **if there is a failure on this line** . . . **the valves will reduce the spill volume significantly**, and represents best available technology, along with other tools.[44]

Based on the OSFM-approved risk analysis, the P&D Staff came to similar conclusions, finding that "[i]nstallation of the proposed BAT elements will reduce the baseline worst case spill volume" by 48% *from existing conditions*.[45]  The Staff further found that "the additional valves included in the proposed project will

---

[42] OSFM, Initial Statement Re: AB 864 Regulations at 12 (emphasis added).

[43] *Id.* at 9 (emphasis added).

[44] Ex. A, Bd. Hrg. Tran. at 67:20-23 (emphasis added).

[45] Staff Rep. at 31; *id.*, Attachment O – OSFM Approval of Risk Analysis.

*significantly reduce the volume* of a potential pipeline release by affording the operator more control to limit the volume of a spill."[46]

61.     Without any legitimate grounds to deny the Project, the Planning Commission and Board reached beyond the appropriate scope of the proceedings—safety valves—and relied instead on pure speculation about the integrity, restart, and operation of the Pipeline and potential restart of LFC and SYU to reach their pre-determined denials.

62.     Tellingly, neither the Planning Commission nor the Board cite any evidence to support the finding that "the frequency of a potential future spill may be increased because of the degradation to the pipeline's integrity that has occurred since its commissioning in 1994."  They cannot rely on public comment to fill this evidentiary gap.  The public cannot observe or inspect the conditions of the Pipeline because it's underground. And laypersons are not experts in pipeline safety or integrity and so could not comment on the condition of the Pipeline even if it was visible above-ground.  Nor was any evidence submitted related to the Pipeline's current integrity.[47]

63.     PPC maintains the integrity of the Pipeline and its equipment through ongoing inspections, maintenance, and surveillance.  During the August 22 hearing, Chief Hosler confirmed that the Pipeline is currently holding pressure with inert nitrogen gas.[48]  And, in any event, before a drop of oil flows through the Pipeline,

---

[46] *Id.* Attachment C1-Addendum at 7, 12, 13 (emphasis added).

[47] To the extent that the Planning Commission or Board relied on the Failure Investigation Report prepared by PHMSA in *2016*, that information is now out of date as substantial work has been done to repair the Pipeline since then.  Moreover, the Pipeline's condition is subject to the comprehensive safety and operational requirements of the Consent Decree issued in 2020 in *United States of America et al. v. Plains All American Pipeline L.P. et al.*  Both OSFM and PHMSA—the only agencies with authority to regulate the Pipeline's integrity and safety—are parties to the Consent Decree, which, *inter alia*, requires all corrective actions to be addressed before the Pipeline restarts.  If PHMSA's 2016 report meant that the Pipeline could never be safely restarted, then PHMSA would not have entered the Consent Decree providing a path to restart.

[48] Ex. A, Bd. Hrg. Tran. at 77:2-78:4.

PPC will have to present evidence to OSFM demonstrating that the Pipeline is intact and safe:

> SUPERVISOR NELSON: ...*I think there's this vision out there that these corroded pipes that are underground* and that they would -- you know, *as soon as any kind of fluid would be in there, that they'd be leaking out,* but if it's holding pressure, that seems to me that makes sense, that it's intact.

> CHIEF HOSLER: And *before liquids would be introduced, the operator would be required to provide us analysis and testing and proof that the line would hold liquids.*[49]

As the federal and state agencies invested with *exclusive authority* to regulate pipeline safety, any potential concerns about the Pipeline's integrity or ability to safely restart is up to PHMSA's and OSFM's authority to address; *not* the Planning Commission's and *not* the Board's.[50]

64.    The Planning Commission and the Board exceeded their jurisdiction in voting to deny the Project based on their concerns regarding the Pipeline's integrity and the impacts of restart:

- **The Planning Commission** voted to deny because "the frequency of a potential future spill may be increased because of the degradation to the pipeline's integrity."[51]

- **Supervisor Capps** voted to deny because in her view "it defies logic for me that you would need safety valves if you don't restart," reducing the Project to be all "about putting oil back in that pipeline," which was "not something [she could] stand behind."[52]

- **Chair Williams** all but abandoned AB 864—the very bill he

---

[49] *Id.* at 78:5-16.

[50] *See, infra,* ¶¶ 68-73.

[51] Plan. Comm'n (Apr. 26, 2023) Finding 2.1.2.1(E).

[52] Ex. A, Bd. Hrg. Tran. at 170:16-171:12.

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

authored—and its statutory mandate for the Pipeline to use BAT measures to vote against the Project because he just could not "remove this decision [on safety valves] from the context of the damage that's being made to the world [by oil and gas]…"[53]

Those issues were *not* before the Planning Commission and the Board and are *beyond* their jurisdiction to regulate.

65.    The Board members who voted in favor of the Project called out this clear abuse of discretion during the August 22 hearing.  Explaining his vote to grant PPC's appeal and authorize the safety valves, Supervisor Bob Nelson stated:

> ***I think that what we have here today is a very narrowly focused requirement in the Board.  We may not like it.  We may want additional powers here to have local control****….  **We are limited, at the end of the day, to our purview and right now our purview is these valves****….  Our own staff kept constant with the original recommendation that is, as stated by planning staff, grounded in State law.  We may not like it.  We may not -- wish there could be something different.  **I believe that's what we have to do up here on the Board***.[54]

66.    Supervisor Lavagnino went even further, acknowledging the Board's history of animus to ExxonMobil and the oil industry in general and recognizing that it cannot serve as a ground for denying the Project:

> …I think I can now point to a pretty long litany of issues, of votes that I have supporting transitioning to cleaner energy, but ***it's a transition and that's what always seems to get lost here*** is that when we come to these hearings, ***it's don't ship it, don't truck it, don't pipeline it, but I still want to use it*** – or maybe you don't want to use it, but the ***vast majority of people in Santa Barbara***

---

[53] *Id.* at 176:12-22.  And while he based his decision on climate change concern, even Chair Williams admitted that "[w]e are not on track to make sufficient emissions reductions in this County, *even if the Santa Ynez unit does not restart*."  *Id.* at 177:3-5 (emphasis added).

[54] *Id.* at 167:22-168:24 (emphasis added).

*County are using and basically addicted to* this product, which is *petroleum*.

So we're not transitioning.  We talk about it, *we hate Exxon, we hate oil companies, we don't want to do anything with them, but we use their product.*   So *I look at this as what we're supposed to be discussing today* -- and I understand why you look at the big picture, but *the reality is sometimes, as Supervisor Nelson said, our jobs are to work inside of a legal framework* that makes it very difficult for us to make the decision that maybe our emotions want us to.

So I totally get the thinking on the other side, I understand…*but the reality is it is the legally defensible, right thing to do.*  And so I know that's not easy to do as staff, so appreciate where you went on this and even though *it may or may not be what I would like to do, I would definitely be voting to uphold the [PPC] appeal.*[55]

67.     Supervisors Nelson and Lavagnino got it right and so did the P&D Staff who stood by their recommendation to approve the valves before the Board even after the Planning Commission voted to deny the Project.  Popular or not, ExxonMobil and PPC have the legal right to continue to operate within the County.  Neither the Board nor the Planning Commission should be allowed to exceed their jurisdiction to pursue partisan agendas aimed at undermining PPC and ExxonMobil's respective vested rights.

**3.     OSFM and PHMSA Have Exclusive Jurisdiction to Regulate the Pipeline's Restart and Safety, Preempting the Planning Commission and Board's "Health" and "Safety" Findings.**

68.     The fundamental error infecting the Planning Committee's and Board's decisions to deny the Project is that both supplanted OSFM's judgment and authority.  Even if the Planning Commission's and Board's findings were supported by evidence—and, again, they are not—the denial was rooted in purported issues with the Pipeline's integrity and restart and the subsequent restart of LFC and SYU.

---

[55] *Id.* at 172:4-13, 173:19-174:2, 175:8-16.

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

1    Those matters lie beyond their jurisdiction.

2        69.    Under the federal Hazardous Liquid Pipeline Safety Act ("HLPSA"),

3    PHMSA has authority to regulate oil pipelines in "furtherance of the highest degree

4    of safety in pipeline transportation and hazardous materials transportation."[56]

5        70.    In accordance with HLPSA, PHMSA may certify appropriate state

6    authorities to prescribe and enforce safety standards and practices of intrastate

7    pipelines.  In California, the sole agency certified by PHMSA and authorized by the

8    California Legislature with authority over pipeline safety is OSFM.[57]  HLPSA

9    preempts the Planning Commission's and Board's decision to deny the Project

10   based on their purported concerns about the safety of the Pipeline.[58]

11       71.    The Project denial is likewise preempted by state law.  Government

12   Code section 51010 of California's Pipeline Safety Act provides:  "It is the intent of

13   the Legislature, in enacting this chapter, that the State Fire Marshal shall exercise

14   exclusive safety regulatory and enforcement authority over intrastate hazardous

15   liquid pipelines..."  This statute expressly preempts any local agencies, decisions, or

16   laws that conflict with or seek to usurp OSFM's exercise of its authority and its

17   decisions.  And OSFM approved the valves.[59]  The Planning Commission's and

18   Board's bald attempt to sidestep OSFM's authority under the guise of pipeline

19   safety (over which they have *no* authority) must fail as a matter of law.

20       72.    Any local interest the County may have in regulating pipeline safety

21

22   _____

     [56] 49 U.S.C. § 108(b); 49 C.F.R. § 195.0 (49 C.F.R. Part 195 "prescribes safety standards and

23   reporting requirements for pipeline facilities used in the transportation of hazardous liquids").

     [57] *See* Cal. Gov't Code §§ 51010, 51013.1(g)(2).

24
     [58] *See* 49 U.S.C. § 60104(c) ("Preemption.--A State authority that has submitted a current

25   certification under section 60105(a) of this title may adopt additional or more stringent safety

     standards for intrastate pipeline facilities and intrastate pipeline transportation only if those

26   standards are compatible with the minimum standards prescribed under this chapter. A State

     authority may not adopt or continue in force safety standards for interstate pipeline facilities or

27   interstate pipeline transportation.").

28   [59] *See, supra,* ¶ 35.

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

cannot trump the state's interest in uniform safety regulation.  This is particularly true in the case of the Pipeline, which runs through three counties, two of which—Kern and San Luis Obispo—have already authorized installation of the safety valves.  Santa Barbara stands alone in its pernicious refusal to approve these state-mandated and approved safety measures.

73.    The Consent Decree also recognizes OSFM and PHMSA as the lead regulators charged with overseeing the Pipeline's integrity, restart, and operation.[60] The Consent Decree requires all corrective actions and comprehensive safety and operational requirements to be addressed before the Pipeline restarts.[61]

**E.    The Project's Denial was Intended to Affect PPC's Vested Right to Restart the Pipeline.**

74.    PPC stepped into Plains's shoes when it purchased the Pipeline, inheriting its predecessor's rights.  The County granted Plains a permit—the Pipeline Development Plan—to construct, maintain, and operate the Pipeline, which remains in full force and effect.[62]  Plains completed construction, operated the Pipeline for decades, and incurred millions in costs.  By virtue of these efforts and expenditures, Plains had vested rights vis-à-vis the County to restart and continue to operate the Pipeline.  As Plains's successor in interest, that vested right now belongs to PPC.

75.    The County has acknowledged this right.  The P&D Staff found that "under the County permit, the operator maintains the ability to restart Lines 901 & 903 at any time without discretionary approval by a County decision maker."[63]

76.    The Central District of California has as well.  Following the

---

[60] *See generally,* Dkt 6, *United States of America et al. v. Plains All American Pipeline L.P. et al.*, Consent Decree at Appendices B and D.

[61] *Id.*

[62] *See generally,* Pipeline Development Plan.

[63] *See* Staff Rep. at Issue #3; *id.* at Issue #7 (same).

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Pipeline's rupture in 2015, the United States, California, PHMSA, OSFM, and multiple agencies tasked with protecting the environment sued Plains, resulting in a Consent Decree entered by the Court in 2020, which recognizes the vested right of Plains or any successor owner of the Pipeline to restart after it meets certain safety requirements and obtains approval by OSFM.[64]

77.     During Board's August 22 hearing, Supervisor Nelson sagely observed: "I don't see how we deny [PPC's] appeal [to have the Project approved], unless [the] goal of this Board is to obstruct the vested rights of the PPC."[65]  It was. The Planning Commission and the Board intended to substantially impair PPC's vested right when they voted to deny the Project.

78.     PPC bought the Pipeline based on the expectation that restart was an option that could be pursued, providing PPC with a steady stream of profits and ExxonMobil, its affiliate, with access to a pipeline for transporting SYU's oil.  The County's policy and ordinances express a preference for pipelines (as compared to transport by marine vessel or tanker truck) because pipelines pose a lower risk of oil spills and air pollution.  And the same policy position is embedded in the 1987 Final Development Plan for ExxonMobil's SYU ("SYU Development Plan"), which requires that SYU's oil be transported by pipeline.[66]  Indeed, the Board has repeatedly insisted that SYU's oil can only be transported via the Pipeline, a position it recently successfully enforced in court.[67]

---

[64] *See* Dkt 6, *United States of America et al. v. Plains All American Pipeline L.P. et al.*, Consent Decree dated at Appendix D ¶ 1c ("After the OSFM approves the Restart Plan, Plains may return Line 901 to service."); *id.* at ¶1g (same for Line 903).

[65] Ex. A, Bd. Hrg. Trans. at 168:17-20.

[66] SYU Development Plan at 17.

[67] Following the Pipeline's rupture, ExxonMobil applied for a permit to temporarily truck SYU's oil for up to seven years or until a pipeline became available.  The Board voted three to two to deny that application.  ExxonMobil filed a writ to challenge that decision.  *See* Dkt 54, *Exxon Mobil Corporation v. Santa Barbara County Board of Supervisors, et al.* (Case No. CV 22-3225), Order Re Cross-Mts. for Sum. Judg. dated September 27, 2023 at 3-6.  In the course of defending its decision, the Board insisted that ExxonMobil "will not be driven out of the oil business because it cannot transport oil by truck, but must wait for a pipeline."  Dkt. 34-1, Mem. of Ps &

79.     Though it has owned the Pipeline for only about a year, PPC has already spent millions on improvements.  It will spend millions more annually on maintenance and property taxes alone—even while progressing work related to the active Pipeline.

80.     The Planning Commission's and Board's denial exceeds its authority for purposes of the Project.

**F.     The Project's Denial Substantially Interferes With ExxonMobil's Vested Right to Restart SYU.**

81.     During the August 22 Board hearing, Supervisor Lavagnino acknowledged that the Project's denial further encroaches on ExxonMobil's vested rights, noting that "this is Exxon…and whether you like it or not, *they do have a vested right* to that product," i.e., SYU's oil.[68]

82.     The SYU Development Plan vests ExxonMobil with the right to restart SYU to produce and transport oil.[69]  While the Board and Central District of California have interpreted this right as being restricted to transportation by pipeline, there is no dispute that ExxonMobil's vested right exists.[70]  The County's attempt to prevent transportation by pipeline (after successfully arguing that ExxonMobil need only wait for a pipeline) thus directly impacts ExxonMobil's vested rights.

---

As ISO Santa Barbara Cnty. Bd. of Supervisor's Mot. for Part. Summ. Jdg., at 10.  The Court ultimately accepted that position and denied the writ.  Dkt. 54, Order Re Cross-Mts. for Sum. Judg. at 12 ("The Board's decision in this case does not permanently implicate Exxon's vested right to use its SYU facilities, but only halts its proposed 'restart' which itself was a temporary fix to a bigger problem: the lack of viable pipeline transport.… And since Exxon is actively pursuing reinstatement of the pipelines, its economic harm is not indefinite.").

[68] Ex. A, Bd. Hrg. Trans. at 174:14-17.

[69] SYU Development Plan at 7.

[70] *See* Dkt 54, *Exxon Mobil Corporation v. Santa Barbara County Board of Supervisors, et al.*, Order Re Cross-Mts. for Sum. Judg. at 11 ("The parties do not dispute that Exxon has a vested right to operate the SYU facilities to extract oil and transport it via pipeline per its 1987 Permit, but the Court does not consider that vested right to encompass its Modified Interim Trucking Plan in light of the permissive language in the County's policies, plans, and ordinances.").

83.     ExxonMobil has owned and operated SYU—legally and safely—for decades.  It has invested significant resources in the facilities' growth, development, and operation, including spending millions on employing the County's citizens, filling its coffers with taxes, and complying with its regulations.  Moreover, ExxonMobil has 16 federal leases for the 114 offshore wells connected to SYU's offshore platforms.  These wells still have significant reserves.

84.     The Planning Commission and Board denied the Project as part of their ongoing efforts to interfere with ExxonMobil's lawful use of its property and drive the company out of Santa Barbara, substantially affecting ExxonMobil's vested right to restart SYU.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### PPC's Petition for Writ of Mandate

### (Cal. Civ. Proc. Code §1085)

85.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 84 above as if fully set forth herein.

86.     PPC seeks a writ of mandate pursuant to California Code of Civil Procedure § 1085 directing the Planning Commission and Board to approve the safety valve permit applications.

87.     The Planning Commission's and Board's decision to deny the Project in toto was arbitrary, capricious, without evidentiary support, and contrary to law.

88.     The Planning Commission and Board acted in an arbitrary and capricious manner and in excess of their jurisdiction by denying the Project in its entirety, rather than limiting their review to the nine valves that were the subject of the three parties' appeals.

89.     The Planning Commission and Board acted in an arbitrary and capricious manner and in excess of their jurisdiction by applying the CZO to the nine valves located outside of the Coastal Zone.

90.     The Project denial—pursuant to CZO §§ 35-169.4.3, 35-172.11.2, and 35-174.10.2, and LUDC § 35.84.040.D.3—lacked evidentiary support.  Among other evidentiary failures, (a) there was no evidence demonstrating that the one CHK or six MOV valves in the Coastal Zone would adversely affect the public viewshed—indeed similar installations already exist along the Gaviota Coast—and nine of the valves were designated for use *outside* of the Coastal Zone; and (2) the finding that all sixteen the valves "would be detrimental to . . . health, safety, comfort, convenience, and general welfare of the neighborhood and environment" is contrary to the express provisions and purposes of AB 864—a law enacted to improve safety and reduce the risks associated with potential releases via the use of BAT measures like the automatic safety valves.

91.     The Planning Commission and Board acted in an arbitrary and capricious manner by predicating their decision to deny the Project on unsubstantiated conjecture about the Pipeline's integrity, restart, and operation. The installation of valves—and not pipeline safety or restart (or the restart of SYU)—was the only issue subject to their review and within the purview of their ministerial duties.

92.     The Planning Commission and Board acted beyond the scope of their power, authority, and jurisdiction by seeking to regulate the Pipeline's integrity, restart, and operations, which all fall under the exclusive jurisdiction of PHMSA and OSFM under well-established principles of state and federal law.

93.     PPC has been, is, and will continue to be harmed if the order requested by this petition is not granted.

94.     PPC has no other plain, speedy, or adequate remedy in the ordinary course of law to compel the Planning Commission and Board to approve the Project.  The Project Denial was not appealable to the Coastal Commission and the Board has made clear that it is irrevocably deadlocked.

95.     PPC seeks a writ under California Code of Civil Procedure § 1085,

1  mandating that the denial of the Project be reversed and that the safety valve

2  applications be approved.

3  ### SECOND CAUSE OF ACTION

4  ### PPC's Petition for Writ of Administrative Mandate

5  ### (Cal. Civ. Proc. Code § 1094.5)

6  96.    Plaintiffs reallege and incorporate by reference the allegations set forth

7  in paragraphs 1 through 95 above as if fully set forth herein.

8  97.    PPC seeks a writ of mandate pursuant to California Code of Civil

9  Procedure § 1094.5 directing the Planning Commission and Board to vacate and set

10  aside the denial of the Project and reconsider and approve the safety valve permit

11  applications within the proper limits of their jurisdiction.

12  98.    PPC has a fundamental vested right to restart the Pipeline by virtue of,

13  *inter alia*, (a) the terms of the Pipeline's Development Plan; (b) the time,

14  expenditures, and effort expended by Plains in constructing and operating for

15  decades; and (c) the Consent Decree.  The Project denial was intended to

16  substantially affect those rights, warranting *de novo* review and application of the

17  Court's independent judgment pursuant to California Code of Civil Procedure §

18  1094.5(c).

19  99.    The Planning Commission's and Board's unlawful denial of the

20  Project was made in excess of their jurisdiction and is a prejudicial abuse of

21  discretion, as it was not made in the manner required by law and the findings were

22  not supported by the evidence.

23  100.   The Planning Commission and Board acted in excess of their

24  jurisdiction and did not proceed in the manner required by law by denying the

25  Project in its entirety, rather than limiting their review to the nine valves that were

26  the subject of the three parties' appeals.

27  101.   The Planning Commission and Board acted in excess of their

28  jurisdiction and did not proceed in the manner required by law by applying the

CZO to the nine valves located outside of the Coastal Zone.

102.   The Project denial—pursuant to CZO §§ 35-169.4.3, 35-172.11.2, and 35-174.10.2, and LUDC § 35.84.040.D.3—was not supported by the evidence in the record.  Among other evidentiary failures, (a) there was no evidence demonstrating that the one CHK or six MOV valves in the Coastal Zone would adversely affect the public viewshed—indeed similar installations already exist along the Gaviota Coast—and nine of the valves were designated for use *outside* of the Coastal Zone; and (2) the finding that all sixteen the valves "would be detrimental to . . . health, safety, comfort, convenience, and general welfare of the neighborhood and environment" is contrary to the express provisions and purposes of AB 864—a law enacted to improve safety and reduce the risks associated with potential releases via the use of BAT measures like the automatic safety valves.

103.   The Planning Commission and Board acted in excess of their jurisdiction and did not proceed in the manner required by law by predicating their decision to deny the Project on unsubstantiated conjecture about the Pipeline's integrity, restart, and operation.  The installation of valves was the only issue subject to their review.

104.   The Planning Commission and Board acted in excess of their jurisdiction and did not proceed in the manner required by law by seeking to regulate the Pipeline's integrity, restart, and operations, which all fall under the exclusive jurisdiction of PHMSA and OSFM under well-established principles of state and federal law.

105.   PPC seeks a writ of mandate to vacate and set aside the Planning Commission's and Board's denial of PPC's Project and to reconsider it in light of the Court's opinion and judgment.

**THIRD CAUSE OF ACTION**

**PPC's Declaratory Relief—United States Constitution
Supremacy Clause & California's Pipeline Safety Act**

**(28 U.S.C. §§ 2201, 2202; 42 U.S.C. § 1983;
Government Code § 51010; Cal. Code Civ. Proc. § 1060)**

106.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 105 above as if fully set forth herein.

107.   Pipeline safety, restart, and operation are under the exclusive federal jurisdiction of the OSFM and PHMSA.  As such, they are beyond the authority of the County under the Supremacy Clause of the U.S. Constitution.

108.   The Supremacy Clause provides that "the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Constitution, Art. VI, cl. 2.  The Supremacy Clause preempts state or local governments from interfering in a field fully occupied by federal agencies and law.

109.   Under the federal HLPSA, PHMSA is granted authority to regulate oil pipelines and may certify appropriate state authorities to prescribe and enforce safety standards and practices of intrastate pipelines.  In California, the sole agency certified by PHMSA and authorized by the California Legislature with authority over pipeline safety is OSFM.  Where a state legislature delegates the exclusive authority to regulate pipeline safety with a state agency, HLPSA (federal law) preempts local authorities from imposing safety requirements on oil pipelines.  The Planning Commission's and the Board's attempts to sidestep OSFM's authority by premising denial on the Pipeline's integrity, restart, and operation is a bold misstep given the clear jurisdictional issues.  This is an affront to the Supremacy Clause.

110.   Further, Government Code section 51010 of California's Pipeline Safety Act makes clear that OSFM, and not local authorities, make pipeline safety

- 38 -

1    regulatory and enforcement decisions.

2        111.   Any local interest the Planning Commission and Board may have in

3    regulating pipeline safety is overcome by the State's interest in uniform safety,

4    particularly in the case of the Pipeline because it runs through three counties, and

5    similar applications have already been approved in Kern and San Luis Obispo

6    Counties.

7        112.   And, at all times, the Planning Commission and Board acted under

8    color of state law.

9        113.   The Project denial is invalid under the Supremacy Clause of the United

10   States Constitution, in violation of 42 U.S.C. § 1983 and Government Code section

11   51010 of California's Pipeline Safety Act.  These laws protect PPC from

12   ordinances and local agency actions that overstep its jurisdictional limits.

13       114.   Accordingly, PPC seeks a declaration that the Project denial violates

14   the Supremacy Clause of the United States Constitution and Government Code

15   section 51010 of California's Pipeline Safety Act.

16                              **FOURTH CAUSE OF ACTION**

17   **Plaintiffs' Declaratory Relief—United States Constitution Commerce Clause**

18                       **(28 U.S.C. §§ 2201, 2202; 42 U.S.C. § 1983)**

19       115.   Plaintiffs reallege and incorporate by reference the allegations set forth

20   in paragraphs 1 through 114 above as if fully set forth herein.

21       116.   Oil and gas are articles of commerce subject to the sole power of

22   Congress to regulate interstate commerce under the Commerce Clause of the U.S.

23   Constitution.

24       117.   The Commerce Clause provides that only "[t]he Congress shall have

25   the Power … [t]o regulate Commerce … among the several States . . .."  U.S.

26   Constitution, Art. I, § 8, cl. 3.  Likewise, the Commerce Clause bars state or local

27   governments from unjustifiably discriminating against or burdening the flow of

28   articles of commerce or passing laws that regulate commerce outside of their

borders.  U.S. Constitution, Art. I, § 8, cl. 3.  These two dictates of the Commerce Clause protect the same scope of interests.

118.   The campaign for, intent of, and effect of the Project denial are to implement the Planning Commission's and Board's unofficial policy to oust oil and gas commerce from Santa Barbara County.  The Project denial effectively labels oil and gas producers and transporters—including PPC and ExxonMobil—as outsiders and imposes insurmountable barriers, thereby excluding them from the California and national markets for oil and gas.  The Pipeline must comply with AB 864, and ExxonMobil cannot restart SYU without the Pipeline to carry its oil to market.  Thus, the Project denial and the Planning Commission's and Board's policy to eliminate oil and gas production amounts to an attempted de facto ban on crude oil production and transportation in and off the coast of Santa Barbara County.  This ban imposes hundreds of millions of dollars of costs and lost revenues on PPC by stopping the restart of the Pipeline and ExxonMobil by stopping the restart of SYU.

119.   The Project denial provides no benefits to the County and deprives consumers of a local, lower-carbon-intensive, and more heavily regulated energy source than the foreign-produced oil and gas that must now satisfy consumer demand.

120.   The Project denial—on its face and as applied—reflects a policy to prohibit the production and transportation of crude oil in and off the coast of Santa Barbara County.  The Project denial is intended to stop the restart of the Pipeline and SYU, resulting in PPC, ExxonMobil, and the County suffering from large-scale economic losses.  The Project denial also enacts a barrier against the production and transportation of crude oil that originates outside the County.

121.   The Planning Commission and Board denied the Project with a discriminatory purpose making the denial *per se* invalid.  And, at all times, the Planning Commission and Board acted under color of state law.

122.   The Project denial constitutes an undue burden on interstate

- 40 -

commerce, outweighing the illusory, asserted benefits of the denial, and violates the Commerce Clause.

123.   The Project denial has an impermissible extraterritorial reach when aggregating burdens to commerce, should other localities impose similar restrictions as Santa Barbara County's denial.

124.   The Project denial deprives PPC and ExxonMobil of their respective rights under the Commerce Clause of the United States Constitution, in violation of 42 U.S.C. § 1983.  PPC and ExxonMobil are entitled to damages and attorney's fees.  The Commerce Clause protects PPC and ExxonMobil from ordinances and local agency actions that discriminate against or unduly burden commerce or impose burdens beyond the jurisdiction's borders.

125.   The Project denial prevents PPC and ExxonMobil from conducting their respective business of transporting and producing crude oil, a class of business that is national and regulated by Congress.  PPC and ExxonMobil have been damaged in the millions of dollars as the companies each face the loss of business originating from the transportation and production of crude oil.

126.   As a direct and proximate result of the Planning Commission's and the Board's actions, PPC and ExxonMobil have suffered and continue to suffer substantial damages in an amount to be proven at trial.

127.   Accordingly, PPC and ExxonMobil seek a declaration that the Project denial violates the Commerce Clause of the United States Constitution.

### FIFTH CAUSE OF ACTION

**Plaintiffs' Declaratory Relief—California Implied Commerce Clause**

**(28 U.S.C. §§ 2201, 2202; Cal. Code Civ. Proc. § 1060)**

128.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 127 above as if fully set forth herein.

129.   Consistent with the federal Constitution's Commerce Clause, the California Constitution bars discrimination by local governments against the flow

of commerce within California, bars measures that unduly burden that commerce, and bars measures that regulate commerce outside a locality's borders.

130. The production and transportation of oil and gas in California is a highly regulated industry and substantially affects commerce.

131. The Project denial—on its face and as applied—prohibits the production and transportation of crude oil within the County destined for refining and consumption outside of its boundaries, thereby denying production and transportation outside of the County.

132. The Project denial—on its face and as applied—seeks to terminate oil and gas industry activities in the County.

133. In its intent and effect, the Project denial discriminates against commerce in oil and gas produced and refined outside Santa Barbara County.

134. The Project denial constitutes an undue burden on commerce in violation of the California Constitution.

135. The Project denial has an impermissible extraterritorial reach when aggregating burdens to commerce, should other localities impose similar restrictions as the Planning Commission's and Board's denial.

136. Accordingly, PPC and ExxonMobil seek a declaration that the Project denial is in violation of the California Constitution.

## SIXTH CAUSE OF ACTION

**PPC's Declaratory Relief and Violation of the California Constitution — Illegal Exercise of Police Power**

**(28 U.S.C. §§ 2201, 2202Cal. Const. Art XI, § 7; Cal. Code Civ. Proc. § 1060)**

137. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 136 above as if fully set forth herein.

138. The denial of a permit is an exercise of a county's police power under the California Constitution. Cal. Const. Art XI, § 7.

139. California Constitution Art XI, § 7 states that "[a] County or city may

- 42 -

make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."

140.   A locality's capacity to use its police power is not unlimited.  Under California law, a local jurisdiction may not exercise its police power in a manner that does not in fact reasonably relate to the general welfare, including of other communities.  Local actions must reasonably accommodate the regional welfare.

141.   The Project denial significantly affects residents outside Santa Barbara County.  For example, the Project denial prevents installation of safety valves on the Pipeline, which affects the regional welfare of residents in Kern and San Luis Obispo Counties, which have issued approvals for safety valves on other segments of the Pipeline.

142.   In denying the Project, the Planning Commission and Board made no attempt to accommodate competing interests on a regional basis and failed to properly base a decision on a "real or substantial relation to the public welfare." The Project denial therefore exceeds the County's police power under the California Constitution.

143.   Accordingly, PPC seeks a declaration that the Project denial is an invalid exercise of police power.

### **PRAYER FOR RELIEF**

WHEREFORE, PPC and ExxonMobil respectfully request that the Court:

A.     Issue a writ of mandate directing the Planning Commission and Board to:

1.     Pursuant to Code of Civil Procedure section 1085, approve the permit applications for each of the safety valves;

2.     Pursuant to Code of Civil Procedure section 1094.5, vacate and set aside the denial of the Project and reconsider and approve the safety valve permit applications in light of the Court's opinion and judgment.

B.     Issue a declaratory judgment that:

- 43 -

1.      The denial of the Project application violates the Supremacy Clause of the United States Constitution and Government Code section 51010 of California's Pipeline Safety Act and is therefore invalid and unenforceable;

2.      The denial of the Project application violates the Commerce Clause of the United States and the California Constitution and is therefore invalid and unenforceable; and

3.      The denial of the Project application constitutes an unconstitutional exercise of police power under the California Constitution and is therefore invalid and unenforceable.

C.      Award PPC and ExxonMobil damages and interest thereon, according to proof;

D.      Award PPC and ExxonMobil their reasonable attorney's fees and costs; and

E.      Award PPC and ExxonMobil such other and further relief as the Court deems just and proper.


Dated:  November 1, 2023                    Respectfully submitted,


                                            By:    */s/ Dawn Sestito*
                                                   Dawn Sestito

                                            *Attorney for Petitioner and Plaintiff*
                                            Pacific Pipeline Company

                                            *Attorney for Plaintiff*
                                            Exxon Mobil Corporation

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

**VERIFICATION**

I, Saul Flota, am the Vice President of Pacific Pipeline Company ("PPC"), and I am authorized to execute this verification on behalf of PPC. I have read the foregoing **VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof. The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that I have executed this Verification on this 30 day of October, 2023, in Spring, Texas.

Saul Flota

PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

**VERIFICATION**

I, Nathan Franka, am SYU Asset Manager of Exxon Mobil Corporation ("ExxonMobil"), and I am authorized to execute this verification on behalf of ExxonMobil.  I have read the foregoing **VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof. The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that I have executed this Verification on this 25 day of October, 2023, in Santa Barbara, California.

_____
Nathan Franka